IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| WESLEY HOUSING DEVELOPMENT CORPORATION OF NORTHERN VIRGINIA <br><br> and <br><br> WESLEY COPPERMINE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SUNAMERICA HOUSING FUND 1171, A NEVADA LIMITED PARTNERSHIP, <br><br> and <br><br> WESLEY COPPERMINE LIMITED PARTNERSHIP, <br><br> Defendants. | Civil Action No. 1:21-cv-1011 |

**MEMORANDUM OPINION**

The threshold issue in this removed breach of contract case is whether the plaintiffs' motion to remand should be granted on the basis of the absence of removal jurisdiction. Plaintiffs' motion to remand has been fully briefed, was argued orally on December 17, 2021, and is therefore ripe for disposition. Defendant contends that both federal question jurisdiction and diversity jurisdiction support removal. Careful review of the complaint and the underlying facts contradict this argument; there is no federal question or diversity jurisdiction, and hence the case must be remanded to state court.

1

I.

The case involves a dispute over the purchasing rights of an affordable housing development located in Herndon, Virginia (the Coppermine Place II). Plaintiff Wesley Housing Development Corporation ("WHDC") is non-profit corporation organized under Virginia law. WHDC operates with the mission of providing affordable housing for Northern Virginia residents. Plaintiff Wesley Coppermine, Inc. ("Wesley") is a Virginia corporation. Defendant SunAmerica Housing Fund 1171, LP ("SunAmerica") is a Nevada limited partnership.

In 2021, WHDC, Wesley, and SunAmerica formed Defendant Wesley Coppermine Limited Partnership (the "Partnership") to build the Coppermine Place II and to take advantage of a federal tax subsidy for constructing low income housing. The partnership terms were formalized in a partnership agreement, entered into on February 20, 2001 and amended on March 31, 2004 by the Amended and Restated Agreement of Limited Partnership (the "LPA"). The LPA was designed to qualify the Partnership and the Coppermine II for federal low-income housing tax credits ("LIHTC") pursuant to 26 U.S.C. § 42.

Before discussing further factual developments between the parties, it is useful to describe the LIHTC program briefly. Congress created the LIHTC program in the Tax Reform Act of 1986 for the purpose of addressing a nationwide shortage of affordable housing. *See* Pub. L. No. 99–514 § 252 (1986). The LIHTC program provides incentives to private developers to finance affordable, low-income housing developments by providing developers with a tax credit that helps to offset federal income tax liability. Through the LIHTC program, the federal government allocates tax credits to state housing authorities, and the state housing authorities, in turn, select housing developers to build qualifying housing projects and thereby the developers receive tax credits.

In order to qualify for the LIHTC tax credits, a qualifying affordable housing property must have rent-restricted units and be occupied by a substantial portion of individuals who earn below-average annual incomes. *See* 26 U.S.C. §§ 42(g)(1), h(6). To certify compliance (and therefore earn LIHTC credits), the developer is required to submit annual compliance reports to both the federal Internal Revenue Service ("IRS") and a state monitoring agency for fifteen years (the "compliance period"). The LIHTC tax credits pay out over a period of ten years, beginning once the property comes into service. *See* 26 U.S.C. § 42(f)(1). In typical LIHTC projects, the developer sells the tax credit allocation to an outside investor. *See* Mark K. Keightley, Cong. Rsch. Serv., RS22389, *An Introduction to the Low-Income Housing Tax Credit* (2021). The sale of LIHTC credits is often facilitated through a limited partnership agreement between the developer and the outside investor, in which the developer holds a *de minimus* ownership percentage but operates as the general partner responsible for the building and day-to-day operations of the housing development. In such an arrangement, the outside investor serves as the limited partner with a large ownership percentage (entitling the outside investor to the bulk of the tax credits) but maintains a passive role in the day-to-day operations of the Coppermine Place II propery. *Id.* at 6. Congress contemplated that after an outside investor has collected its tax credits (*i.e.* after ten years have passed), the outside investor may seek to exit the partnership. To this end, Congress incentivized the purchase of the affordable housing development by a non-profit organization dedicated to providing affordable housing, by permitting a non-profit organization to have a right of first refusal ("ROFR") to buy these projects at a statutorily prescribed minimum price. *See* 26 U.S.C. § 42(i)(7)(A).[1]

---

[1] Section 42(i)(7)(A) of Title 26 provides that a private developer can still receive tax credits under the LIHTC program even if there is a "right of 1st refusal held by … a qualified nonprofit organization … to purchase the property after the close of the compliance period…" 26 U.S.C. §

3

This brief discussion of the LIHTC program aids in understanding the parties' business dealings in this case. Here, Wesley, WHDC, and SunAmerica formed the Partnership via the LPA with the intention of qualifying for the LIHTC program. WHDC entered a competitive bidding process to obtain an allocation of housing credits from the Virginia Housing Development Authority. *See* Dkt. 1-1 at 16–17. After WHDC obtained those credits, WHDC and Wesley allowed SunAmerica to enter the partnership as a limited partner with a 99.9% ownership interest, in accordance with the LPA. When SunAmerica entered the partnership, WHDC exited the partnership and Wesley remained as the general partner. Following the allocation of housing credits and SunAmerica's entrance into the partnership, WHDC proceeded to build and develop the Coppermine Place II apartment complex, which consists of 66 apartment units which are all restricted for rents for low-income senior citizens.  In March 2004, the parties entered into a Right of First Refusal and Purchase Option Agreement, which granted WHDC a conditional ROFR (referred to by plaintiffs as a "§ 42 ROFR") to acquire the Coppermine Place II apartment complex after the compliance period had ended and SunAmerica had received its LIHTC tax credits.[2] Throughout the compliance period, Wesley continued to oversee the Partnership's day-to-day operations as the general partner, while SunAmerica collected the vast majority of the tax credits over the ten year period.

---

42(i)(7)(A). The purpose of the § 42 ROFR provision is that it allows the outside investor to continue to receive the tax credit benefit even though the non-profit organization holds a ROFR on the housing development. Ordinarily, the economic substance doctrine would require that the tax credits go to the true "owner" of the LIHTC housing development, which might be understood as the non-profit possessing the ROFR. *See* Rev. Rul. 55-540, 1955-2 C.B. 39, § 4.01(e). Section 42(i)(7) also sets a minimum price of the ROFR. 26 U.S.C. § 42(i)(a)(B).

[2] The purchase price of WHDC's ROFR is set at the statutory minimum price provided in 42 U.S.C. § 42(i)(7)(B). Although Section 42 provides that the presence of WHDC's ROFR does not deprive SunAmerica of its ability to receive LIHTC credits, Section 42 neither defines the term "right of 1st refusal" nor dictates how the ROFR may be exercised.

The compliance period for Coppermine Place II ended on December 31, 2020. As of that date SunAmerica had received the full amount of tax credits contemplated by the LPA. At some point in early 2021, after the compliance period had ended, Community Preservation Partners, LLC ("CPP") began discussions with Wesley about buying an affordable housing property in Northern Virginia. CPP requested due diligence documents about Coppermine Place II and then sent a letter of intent ("LOI") of a purchase offer to the Partnership. The LOI set forth the terms of the offer, including a purchase price, a deposit, and financing arrangements. The LOI explained that it was non-binding, but that acceptance of the LOI would require the Partnership to negotiate in good faith regarding the sale of Coppermine Place II to CPP.

Wesley understood that LOI from CPP to be a "bona fide offer" within the meaning of the LPA between the parties. Wesley intended to accept CPP's offer, thus triggering the ROFR provisions which gave WHDC a right to purchase the property. On July 22, 2021, Wesley provided WHDC with a notice of the offer so that WHDC could exercise its ROFR. On July 23, 2021, WHDC elected to exercise its ROFR right. SunAmerica objected to the exercise of the ROFR in an objection letter, explaining that SunAmerica did not consent to the sale of the property, and threatening to remove Wesley as general partner of the Partnership.

On August 23, 2021, Wesley and WHDC filed suit against SunAmerica and the Partnership in Virginia state court. The complaint alleges three causes of action: (1) declaratory judgment against SunAmerica and the Partnership, seeking a declaration that WHDC validly exercised its ROFR and an order compelling the Partnership to sell the Coppermine Place II to WHDC; (2) breach of contract against SunAmerica and the Partnership, seeking damages and specific performance of the ROFR; and (3) anticipatory breach of contract against SunAmerica and the Partnership, seeking damages and specific performance of the ROFR.

On September 2, 2021, SunAmerica removed the case to federal court on the basis of diversity and federal question jurisdiction. On September 9, SunAmerica filed a motion to dismiss the complaint for failure to state a claim, and on September 21 the plaintiffs filed a motion to remand the case to state court.

## II.

The threshold motion pending in this matter is plaintiffs' motion to remand the case to state court. *See* Dkt. 8. Plaintiffs argue that remand is required because the Court lacks subject matter jurisdiction over this dispute, as the case does not involve resolution of a federal question (therefore defeating jurisdiction under 28 U.S.C. § 1331) and the parties to the case lack complete diversity (therefore defeating jurisdiction under 28 U.S.C. § 1332). The Fourth Circuit has made clear that "the party seeking removal," in this case Defendant SunAmerica, bears the burden of demonstrating federal jurisdiction. *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir.1994).

Section 1441 of Title 28, which governs removal jurisdiction, provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Removal jurisdiction must be narrowly construed because of the "significant federalism concerns" implicated. *Mulcahey*, 29 F.3d at 151. Therefore, "[i]f federal jurisdiction is doubtful, a remand [to state court] is necessary." *Id.* Defendant SunAmerica argues that removal jurisdiction exists in this case for two reasons, namely (1) the case falls under federal question jurisdiction and (2) the case arises under diversity jurisdiction. These two bases for federal jurisdiction are discussed further below.

First, there is no federal question jurisdiction in this case. Analysis of federal question jurisdiction in removal disputes is guided by the well-pleaded complaint rule, under which "removal [to federal court] is appropriate if the face of the complaint raises a federal question." *Lontz v. Tharp*, 413 F.3d 435, 439 (4th Cir. 2005). There is no doubt in this case, however, that the well-pleaded complaint rule is not satisfied, as plaintiff's complaint raises three state law causes of action under Virginia contract law. *See* Dkt. 1-1 at 26–31. That is, the complaint raises questions of state, not federal law, and the Fourth Circuit has articulated the general rule that "state law complaints usually must stay in state court when they assert what appear to be state law claims." *Lontz*, 413 F.3d at 440.

SunAmerica nonetheless argues that federal question jurisdiction exists in this case under an exception to the well-pleaded complaint rule called embedded federal question jurisdiction, "in which state law supplies the cause of action but federal courts have jurisdiction under § 1331 because 'the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Burrell v. Bayer Corp.*, 918 F.3d 372, 380 (4th Cir. 2019) (quoting *Franchise Tax Bd. of Cal v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 28 (1983)). As the Supreme Court has cautioned, the "mere presence of a federal issue in a state cause of action" is insufficient to create embedded federal question jurisdiction, and thus courts should be cautious in exercising jurisdiction in such cases. *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 813 (1986). The Supreme Court has articulated a four-prong test to determine whether embedded federal question exists in a given case. *See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). Under this four-prong test, the federal question allegedly embedded in a complaint must be: (1) "necessarily raise[d]" in the case; (2) "actually disputed" by the parties; (3) "substantial," meaning that resolution of the question is important to the federal system as a

7

whole; and (4) a federal court must be capable of deciding the issue "without disturbing any congressionally approved balance of federal and state judicial responsibility." *Grable*, 545 U.S. at 314.[3] As explained in the foregoing analysis, it is clear that the *Grable* test is not satisfied and that embedded federal jurisdiction does not arise in the instant dispute.

SunAmerica argues that federal jurisdiction exists because resolution of plaintiffs' claims necessarily involves construction and application of Section 42, particularly subsection 42(i)(7). This argument strains credulity. As discussed above, Section 42(i)(7) is a safe harbor provision that provides only that "[n]o Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held by … a qualified nonprofit organization … to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price determined under subparagraph (B)." 26 U.S.C. §42(i)(7). But the present case is a contract dispute, not a tax case, and it is difficult to see how interpretation of this tax safe harbor provision has anything to do with the case at hand. The central dispute in this action is whether the ROFR was properly triggered by CCP's letter of intent, and Section 42 is silent as to when, how, or in what manner the ROFR may be triggered. Indeed, the ROFR is a contractual provision drafted by the parties with language the parties agreed to, not terms or language dictated by federal statute. Interpretation of that contractual provision, therefore, does not require an interpretation or

---

[3] The facts of the *Grable* case provide an illustrative example of cases where embedded federal question jurisdiction may arise. *Grable* involved a state law quiet title action where the former landowner claimed that a federal tax sale operated by the IRS had been invalid. *Grable* 545 U.S. at 310. Specifically, the former landowner argued that the IRS had failed to comply with a federal statute requiring specific procedures for a notice of sale in tax delinquency proceedings. *Id.* at 310–11. The *Grable* Court held that the facts of the case presented "the rare state quiet title action that involves contested issues of federal law" and therefore gave rise to embedded federal question jurisdiction. *Id.* at 319.

adjudication of a federal statute. Accordingly, the complaint does not "necessarily" raise a question of federal law, and the case fails to satisfy the *Grable* test.[4]

In a nearly analogous case, the First Circuit determined that a Section 42 ROFR contract dispute "failed to trigger embedded federal question jurisdiction." *AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 559 (1st Cir. 2021). In *AMTAX*, the facts of which are on all fours with the instant case, the First Circuit observed that Section 42(i)(7) is essentially a safe harbor provision and rejected the argument that resolution of a contract dispute necessarily involved a substantial question of federal tax law. *Id.* Notwithstanding the First Circuit's persuasive opinion in *AMTAX*, SunAmerica points to *Riseboro*, where a district court held that the state law claims in a Section 42 ROFR dispute "raise[d] a necessary, disputed and substantial federal issue" and gave rise to embedded federal question jurisdiction. *Riseboro Cmty. P'ship Inc. v. SunAmerica Hous. Fund No. 682*, 401 F. Supp. 3d 367, 376 (E.D.N.Y. 2019). But *Riseboro* is readily distinguishable from the instant case, as the plaintiff in *Riseboro* invoked Section 42 numerous times in its complaint, alleging that the ROFR at issue in that case "must be interpreted to be consistent with the statutory scheme of Section 42 as mandated by the Restated Agreement" and further that "Section 42 neither includes nor implies a bona fide third-party

---

[4] Even assuming that the parties' dispute did necessarily raise a question of federal law, the proposed federal issue also lacks substantiality, which is required under *Grable*. As the Fourth Circuit has explained "there is a high bar for treating a federal issue as sufficiently substantial under the third prong of the § 1331 analysis." *Burrell*, 918 F.3d at 385. The substantiality prong typically requires that the decision "would be controlling in numerous other cases" and concerns a "pure issue of law" rather than a "fact-bound and situation-specific" determination. *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 681 (2006). But in this case, any interpretation of federal law would be limited to the contract between the parties and confined to the facts of this case. It is doubtful, therefore, that an interpretation of Section 42 (insofar as one is even required) could possibly affect the outcome of any other case, and SunAmerica has failed to argue whatsoever that other LIHTC contracts contain a similarly-worded ROFR provision or would otherwise be affected by the outcome of this litigation. Accordingly, any federal question disputed here lacks substantiality and cannot serve as the basis for federal question jurisdiction.

offer as a condition precedent for a ROFR holder to exercise its ROFR." *Id.* at 371. But unlike the complaint in *Riseboro*, the complaint in this case does not claim that the LPA must be interpreted consistently with Section 42. The parties have also fully briefed a motion to dismiss in this case, and that briefing confirms that the party's disagreement is focused solely on conflicting views of Virginia contract law, and not the federal tax credit provisions created by Section 42. Accordingly, this case presents no basis on which to justify federal question jurisdiction.

SunAmerica also argues that diversity jurisdiction is proper under 28 U.S.C. § 1332(a). The Fourth Circuit recently explained that Section 1332(a) requires complete diversity between the parties, which "means that no plaintiff may share a citizenship with any defendant." *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 352 (4th Cir. 2020). To determine whether diversity jurisdiction exists, therefore, " a federal court must determine and compare the citizenship(s) of all plaintiffs and all defendants before exercising diversity jurisdiction under § 1332(a)." *Id.*

Both plaintiffs in this case are Virginia citizens for the purpose of diversity jurisdiction analysis. Plaintiff WHDC is a non-profit corporation organized under the laws of Virginia and operates with its principal place of business in Alexandria, Virginia. Section 1332(c)(1) provides that, for the purpose of diversity jurisdiction, a "corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business," and WHDC is therefore properly considered to be a Virginia citizen. Plaintiff Wesley is also a Virginia corporation with its principal place of business in Alexandria, Virginia, and is accordingly also deemed to be a Virginia citizen.

The defendants in this case are both limited partnerships, and binding precedent is clear that diversity jurisdiction over a limited partnership depends not on the partnership's place of business, but rather on the citizenship of all of the partnership's members. *See Carden v. Arkoma Associates*, 494 U.S. 185, 196 (1990). The partners of Defendant SunAmerica are citizens of Nevada, California, Texas, and Colorado, and SunAmerica is therefore diverse from the Virginia plaintiffs. The Partnership, however, defeats diversity, as its two members are SunAmerica (whose citizenship is Nevada, California, Texas, and Colorado) and Wesley (whose citizenship is Virginia), and the Partnership is therefore considered to be a citizen of Virginia (as well as Nevada, California, Texas, and Colorado). Because the plaintiffs are Virginia residents, the presence of a Virginia defendant therefore defeats the complete diversity required by §1332(a).[5]

Notwithstanding the undeniable conclusion that the Partnership is a Virginia citizen whose presence in the suit defeats complete diversity, SunAmerica argues that the Partnership's citizenship should be disregarded either because the Partnership is merely a nominal party or because plaintiffs fraudulently joined the Partnership for the sole purpose of defeating diversity. These arguments are addressed in turn below.

SunAmerica's argument that the Partnership is merely a nominal party fails in light of binding precedent. The Supreme Court has explained that diversity jurisdiction must consider

---

[5] At oral argument and in a notice of supplemental authority filed after oral argument, SunAmerica pressed the bewildering and incorrect argument that because the partners of the Partnership reside in different states from one another, complete diversity exists. *See* Dkt. 20. This argument misapprehends the tests for diversity jurisdiction, which requires a determination of "whether both sides of the controversy are completely diverse." *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 120 (4th Cir. 2004). Thus, it makes no difference to analysis of diversity jurisdiction whether the various partners in the Partnership are diverse from one another. The analysis instead is whether each plaintiff in this case is completely diverse citizenship from each defendant. Given that there are two Virginia plaintiffs (Wesley and WHDC) and one Virginia defendant (the Partnership), complete diversity is lacking, therefore defeating diversity jurisdiction.

only "real and substantial parties to the controversy" and that therefore "federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460 (1980). SunAmerica argues that the Partnership is not a real party to the controversy, as its sole members are Plaintiff Wesley and Defendant SunAmerica, and that the Partnership has no real interest in the outcome of this dispute. But this argument ignores the fact that it is the Partnership, and not SunAmerica, which holds the title for Coppermine Place II. To this end, each count of the complaint seeks specific performance of the ROFR agreement against the Partnership. *See* Dkt. 1-1. Indeed, the Fourth Circuit has explained, "the key inquiry" in determining a party's nominal status "is whether the suit can be resolved without affecting the non-consenting nominal defendant in any reasonably foreseeable way." *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013). There is little doubt that in this case, where plaintiffs seek to compel the Partnership to sell a housing development according to the specific terms of the ROFR, that the Partnership will be affected by the resolution of this suit. Indeed, if the plaintiffs prevail, the Partnership will be ordered to sell the Coppermine Place II at a substantially below-market price as specified in the ROFR the parties previously agreed to. Accordingly, the Partnership is not a nominal party and the Partnership's citizenship must be considered in determining whether complete diversity exists between the parties.

      SunAmerica's argument that the Partnership was fraudulently joined is also mistaken. As the Fourth Circuit has explained, the fraudulent joinder doctrine "effectively permits a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 704 (4th Cir. 2015) (internal

quotations and citations omitted). The party alleging fraudulent joinder "bears a heavy burden" and "must show that the plaintiff cannot establish a claim" against the fraudulently joined party. *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999). This doctrine is plainly inapplicable in this case, as the complaint lays out a clear case for specific performance of the ROFR against the Partnership. As discussed above, the Partnership holds title to the Coppermine Place II property and plaintiffs cannot obtain the relief they seek without suing the Partnership. Therefore, the Partnership was not fraudulent joined and the Partnership's citizenship must be considered in assessing whether diversity jurisdiction exists in this case. Because the Partnership's presence in the suit defeats complete diversity, diversity jurisdiction is lacking.

### III.

For the foregoing reasons, plaintiffs' motion to remand must be granted. There is no basis for federal subject matter jurisdiction over this suit, and this state law contract dispute is properly litigated in state court. Furthermore, it is unnecessary and improper to consider SunAmerica's motion to dismiss.

An appropriate Order reflecting the issues in this Memorandum Opinion will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
December 22, 2021

/s/
T. S. Ellis, III
United States District Judge